FILED
SUPERIOR COURT
OF GUAM

2018 MAY -1 PM 3: 14

CLERK OF COURT

By: _____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| MICHAEL J. WIRGES, | CIVIL CASE NO.: CV0775-16 |
| PLAINTIFF, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** (re Complaint for Breach of Contract & Related Tort Claims) |
| JOHN M. ROBERTSON and HERNAN BONSEMBIANTE, | |
| DEFENDANTS. | |

### INTRODUCTION

This matter came before the Honorable Anita A. Sukola for a Bench Trial on November 21, 22, and December 7, 19, and 20, 2017; and January 2, 2018. Attorney Bill R. Mann appeared on behalf of Michael J. Wirges. Attorney Thomas M. Tarpley Jr. appeared on behalf of John M. Robertson and Hernan Bonsembiante. After considering the evidence and testimony presented at the Bench Trial, and the Parties' arguments, the Court issues the instant Findings of Fact and Conclusions of Law.

/ / /

/ / /

/ / /

**ORIGINAL**

CV0775-16 Wirges v. Robertson *et al.*
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page **1** of **23**

# FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

1. Michael J. Wirges ("Plaintiff") is a resident of Guam. The Plaintiff works in the construction and real estate development industries, and is the owner of Sterling Design, Inc., a Guam corporation.

2. John M. Robertson ("Robertson") and Hernan Bonsembiante ("Bonsembiante") (collectively "Defendants") are residents of Guam.

3. Robertson is a civil engineer registered with the Guam Board of Registration for Professional Engineers, Architects, and Land Surveyors.

4. Robertson is the majority shareholder of J.M. Robertson, Inc., a Texas Corporation doing business on Guam as AmOrient Engineering ("AmOrient Engineering"). Robertson is also majority shareholder of AmOrient Contracting, Inc ("AmOrient Contracting").

5. Hernan Bonsembiante ("Bonsembiante") is the Vice President of Operations of AmOrient Engineering.

6. In 2012, Robertson sold forty percent (40%) of the shares in both AmOrient Engineering and AmOrient Contracting to Coffman Engineers, Inc., a mainland U.S. based Corporation ("Coffman"). Robertson retained the law firm of Carlsmith Ball to review the 2012 Stock Purchase Agreements between Robertson and Coffman for the sale.

7. As part of the Agreements to sell stock in both AmOrient Engineering and AmOrient Contracting, Coffman had Put Options on the shares of stock purchased from Robertson in 2012. The Put Options provided, *inter alia*, that in the event of a transfer by any Shareholder, other than Coffman, of any Shares in AmOrient Engineering or AmOrient Contracting, Coffman may provide written notice to the Company and each shareholder, within sixty (60) days from such transfer, that Coffman is electing to sell a specified number of shares. AmOrient Engineering or AmOrient Contracting were then required to redeem the specified shares at a price equal to the Company Enterprise Price. The method for calculating the Company Enterprise Price was laid

CV0775-16 Wirges v. Robertson *et al.*                                    Page 2 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

out in the Coffman-AmOrient Engineering and Coffman-AmOrient Contracting Stock Purchase Agreements.

8. Robertson currently owns sixty percent (60%) of the outstanding shares of AmOrient Engineering and AmOrient Contracting, with Coffman owning the remaining forty percent (40%) of outstanding shares in each corporation.

9. Frederick W. Schmidt ("Schmidt") served as the Contracts Administrator of AmOrient Engineering until July 2016. Schmidt was employed with AmOrient Engineering through the entity FS Development Inc.

10. Schmidt introduced the Plaintiff to the Defendants.

11. In 2015, Robertson and the Plaintiff began negotiating the sale of Robertson's shares in AmOrient Engineering and AmOrient Contracting to the Plaintiff, because Robertson planned to retire to Houston, Texas.

12. On June 10, 2015, Robertson and the Plaintiff signed an Outline of Terms and Conditions for the Sale of Stock in AmOrient Engineering and AmOrient Contracting. The Outline of Terms was admitted into evidence at trial as Defendants' Exhibit A.

13. The Outline provided that the sale was contingent on the mutual agreement of formal Stock Purchase Agreements for the sale and purchase of the shares of each corporation. The Outline also provided the sale was contingent on the agreement of Hernan Bonsembiante to remain employed with AmOrient Engineering for a period up to three (3) years. Finally, the Outline provided that the sale was subject to the approval of the terms of the purchase by Coffman.

14. The Outline laid out *inter alia* the following terms:

    a. Robertson would sell and the Plaintiff would purchase Sixty Percent (60%) of the shares of AmOrient Engineering and AmOrient Contracting in two installments. The first Fifty-Five Percent (55%) of Robertson's shares would be conveyed at closing, and the remaining Five Percent (5%) would pass on the death, disability or retirement of Robertson, whichever came first.

CV0775-16 Wirges v. Robertson *et al.*
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page **3** of **23**

b. The price for Robertson's sixty percent (60%) of share ownership was set at Five Hundred Thousand Dollars ($500,000.00),[1] plus an annual One Hundred Thousand Dollar ($100,000.00) salary to Robertson, provided he continued to work for AmOrient Engineering for five years and for a minimum number of hours. The closing was set for September 1, 2015.[2]

15. On June 17, 2015, Robertson sent an email to David Gardner, Chief Executive Officer and Managing Engineer of Coffman ("Gardner"). The email attached the Outline for Terms of Sale of Stock in AmOrient Engineering and AmOrient Contracting executed by Robertson and the Plaintiff on June 10, 2017. The email and attached outline were admitted at trial as Plaintiff's Trial Exhibit Four.

16. On August 10, 2015, Schmidt sent an email to Gardner and 'Jim Ivers,' with a courtesy copy to the Defendants. Schmidt states in the email that he attached the *drafts* of Stock Purchase Agreements for AmOrient Engineering and AmOrient Contracting for the sale of 95% of John's shares in both companies to the Plaintiff. The first attachment was a document titled, "AmOrient Engineering Stock Purchase Agreement." The second attachment was a document titled, "AmOrient Contracting, Inc. Stock Purchase Agreement." Schmidt's email and the *drafts* of the Stock Purchase Agreements were admitted into evidence at trial as Plaintiff's Exhibit Five.

17. On August 12, 2015, Schmidt forwarded an email from Gardner dated August 12, 2015, to the Plaintiff with a courtesy copy to the Defendants. In the forwarded message, Gardner proposed several terms from Coffman regarding the sale of Robertson's shares in AmOrient Engineering and AmOrient Contracting. The email was admitted into evidence at trial as Plaintiff's Exhibit Six. Coffman Engineers proposed *inter alia* the following:

---

[1] The sale price was broken down to One Hundred Thousand Dollars ($100,000.00) due at closing, and Three Hundred Fifty Eight Thousand Dollars ($358,000.00) payable over eight (8) years at the rate of Forty-Four Thousand Seven Hundred and Fifty Dollars ($44,750.00) per year, and a lump sum of Forty Two Thousand Dollars for the remaining Five Percent (5%) due at the expiration of the fifth year, or the death, disability or retirement of Robertson, whichever came first.

[2] The Outline also provided for consideration of an Employee Stock Purchase plan, an Amendment to the Articles of Incorporation for AmOrient Engineering and AmOrient Contracting, and Robertson's employment benefits during his continued period of employment after closing of the sale.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

    a. A loan from Coffman to AmOrient Engineering was to be paid off in full immediately.

    b. Reduction of Coffman's Forty Percent (40%) share of ownership to Twenty Percent (20%) ownership, with Twenty Percent (20%) of the outstanding shares redeemed using the same valuation[3] as Robertson's agreement with Wirges.

    c. Additionally, in the email Coffman also gave notice of its exercise of the Put Option.

18. On August 17, 2015, Robertson responded to Gardner's email. Robertson stated he wanted to hold off on any deal with Wirges and Coffman until an impending Indefinite Delivery Indefinite Quantity (IDIQ) Contract with Naval Facilities Engineering Command Marianas was executed. Robertson's email was admitted into evidence at trial as Plaintiff's Exhibit Seven. In the email, Robertson stated,

    a. AmOrient Engineering's cash flow would not support a full repayment of the loan from Coffman at the time.

    b. Robertson also disagreed with the valuation of Coffman's shares of the companies at One Hundred Fifty Thousand Dollars ($150,000.00).

19. On August 19, 2015, Robertson and the Plaintiff allegedly executed a document entitled "Option to Purchase Stock Agreement." The Plaintiff also tendered a cashier's check for Twenty-Five Thousand Dollars ($25,000.00) to Robertson as consideration for the Option. The Option Agreement was admitted into evidence at trial as Plaintiff's Exhibit 8. The terms of the Option Agreement provided *inter alia*,

> "Robertson agrees to sell and Wirges agrees to purchase an irrevocable option to purchase Robertson's capital stock in both John M. Robertson Inc., dba AmOrient Engineering and AmOrient Contracting, Inc., in accordance with the terms and conditions of the *Stock Purchase Agreements attached hereto as Exhibits 'A' and 'B.'*"

Pl's Trial Ex. 8 (*emphasis added*).

---

[3] Coffman proposed redemption at One Hundred Fifty Thousand Dollars ($150,000.00) with Fifty Thousand Dollars ($50,000.00) down and the remaining One Hundred Dollars ($100,000.00) financed over three years at Four Percent (4%) interest payable in monthly installments of principal and interest.

CV0775-16 Wirges v. Robertson *et al.*                             Page 5 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

20. While the Option Agreement was allegedly signed on August 19, 2015, the Court finds that no meeting between the Parties took place on that date. The Court further finds there was no review of the Stock Purchase Agreements referenced in the Option Agreement as Exhibits "A" and "B" prior to the execution of the Option Agreement.[5]

21. The Court finds that there were no final and agreed upon Stock Purchase Agreements attached as Exhibits "A" and "B" to the Option Agreement. The Court further finds the Parties had not

---

[5] The Court's findings in Paragraph 19 are compelled by preponderance of the following evidence:

a. There was no conclusive testimony as to when and how the Option Agreement was signed. Schmidt testified that the Option was signed at a meeting on August 19, 2015 with Robertson, Bonsembiante, Schmidt, and the Plaintiff all present. The Plaintiff similarly testified that Robertson, Bonsembiante, the Plaintiff, and Schmidt were all present at a meeting at AmOrient Engineering on August 19, 2015. The Plaintiff testified that each individual had an identical stack of documents that Schmidt walked everyone through. The Plaintiff further testified that he went through the documents page by page, while Schmidt went through the documents with the group generally. Finally, the Plaintiff testified that the Stock Purchase Agreements, Employment Agreement, and Promissory Notes for AmOrient Engineering and AmOrient Contracting, were all in the stack of documents reviewed at that meeting, and no one objected to the documents. The Plaintiff testified that the Shareholders' Agreement was also reviewed prior to the execution of the Option Agreement and that no one raised any objections to that document.

b. Due to the following reasons, the Court does not find Schmidt to be a credible witness. First, the Court finds that a $1.3 million dollar Judgment was entered against Schmidt in a Colorado State Court for fraud. Second, Schmidt testified that he did not make any substantive edits to documents concerning the sale of AmOrient Engineering and AmOrient Contracting after August 19, 2015. Schmidt further testified that the reason the 'date modified' date recorded on the AmOrient Server where the documents were saved showed dates after August 19, 2015 was because he had a habit of hitting save regularly even when he was just viewing and not changing the documents. The Defendants' offered demonstrative testimony during the direct examination of Bonsembiante which demonstrated Schmidt's explanation was impossible because the 'date modified' date does not change if no changes are made and the document is saved. Instead, the demonstrative testimony showed only a change to the document, and subsequent saving of the document changes the 'date modified' date. Thus, Schmidt was either intentionally being untruthful, or had forgotten the work he was doing on the documents. Therefore, the Court rejects Schmidt's accounting of the events surrounding the execution of the Option Agreement.

c. The Defendants both testified that no meeting took place on August 19, 2015. Robertson testified that he signed the Option Agreement in his office with only Schmidt present. Robertson testified that he signed the document quickly and Schmidt likely took the document to the Plaintiff to execute on the same day. Robertson testified that he did not go over any other documents with Schmidt, and that there were no documents attached to the Option Agreement.

d. The Defendants also offered the testimony of Mary Jo Pablo, the Business Manager of AmOrient Engineering, whose workspace is adjacent to the door of the AmOrient conference room where the alleged meeting took place. Ms. Pablo testified that she did not see or have knowledge of the alleged meeting on August 19, 2015.

e. The Defendants also offered testimony and evidence which demonstrated that Robertson regularly noted times and dates of his meetings with the Plaintiff regarding the planned sale of the companies on his weekly timesheet. A series of the Robertson's timesheets were admitted into evidence at trial as Defendants' Exhibit B. Further, the timesheet for the week ending on August 23, 2015 and thus including August 19, 2015 was admitted into evidence as Defendants' Exhibit P. The Defendants showed there was no indication on Robertson's time sheet for the week including August 19, 2015 that a meeting regarding the sale of stock to the Plaintiff took place on August 19, 2015 in the AmOrient Conference Room.

f. Thus, the Court is not convinced with Schmidt's and the Plaintiff's recitation of events surrounding the execution of the Option Agreement when considering the Defendants' account, the credibility of witnesses, and the weight of the evidence discussed above.

CV0775-16 Wirges v. Robertson *et al.*
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page 6 of 23

agreed on the final form of the Stock Purchase Agreements prior to the alleged execution of the Option Agreement on August 19, 2015.[6]

---

[6] The Court's findings in Paragraph 20 are compelled by preponderance of the following evidence:

a. Both the Plaintiff and Schmidt testified that the Stock Purchase Agreements for AmOrient Engineering and AmOrient Contracting were not marked as Exhibit A and B, nor were they attached to the Option Agreement. However, the Plaintiff and Schmidt both testified that the Stock Purchase Agreements were in a stack of documents that were reviewed during the alleged August 19, 2015 meeting. Because the Court finds that no meeting took place, the Court views the testimony that the Stock Purchase Agreements were discussed, and that no one objected to them, with suspicion.

b. Further, neither of the versions of the Stock Purchase Agreements admitted at trial were marked as Exhibits "A" or "B."

c. Robertson testified that there were no attachments to the Option Agreement, and that he did not review any Stock Purchase Agreements when he executed the Option Agreement. Bonsembiante testified that no meeting took place, and that he never attended a meeting where the Plaintiff and Robertson reviewed the Stock Purchase Agreements page by page.

d. The Defendants also introduced a rebuttal exhibit into evidence as Defendants' Exhibit O. Exhibit O is an email from the Plaintiff to Schmidt dated July 18, 2016. In the email, the Plaintiff asks Schmidt "what are exhibits a and b." This demonstrates to the Court that even the Plaintiff was not clear as to what the exhibits A and B referenced in the Option Agreement were.

e. The Defendants also introduced testimony of Mary Jo Pablo, who testified that she retrieved the word document versions of the Stock Purchase Agreements from the AmOrient Server and compared the documents to the August 19, 2015 versions. In the AmOrient Contracting Stock Purchase Agreement as of September 28, 2015, the references to an Employment Agreement in Section Four were deleted sometime after August 19, 2015. While Schmidt testified this was because AmOrient Contracting had no employees and he was fixing an error pasted over from the AmOrient Engineering Stock Purchase Agreement, the Court finds that this fact weighs against finding that the August 10, 2015 version of the Stock Purchase Agreements sent to Coffman were (1) final drafts in agreed on form and (2) were reviewed by Robertson and the Plaintiff prior to execution of the Option Agreement on August 19, 2015.

f. The language of the Stock Purchase Agreements does not demonstrate that they were final documents the Plaintiff and Robertson had reviewed and agreed on. Page 12 of the AmOrient Engineering Stock Purchase Agreement provides that the Agreement may be terminated by any Party if the closing did not occur by October 1, 2015. Further, the AmOrient Contracting Stock Purchase Agreement had a similar provision allowing for termination should the Parties not close by October 1, 2015. Both Stock Purchase Agreements similarly provide for termination pursuant to Section 15(a) when neither document contains a Section 15(a). These provisions for termination would be rendered meaningless by the signing of a valid one year irrevocable option agreement. Thus, these facts cut against finding the Stock Purchase Agreements were in an agreed on, final form as of August 19, 2015.

g. The Stock Purchase Agreements also referenced Robertson's employment agreement with AmOrient. However, there was testimony at trial that after August 19, 2015 Robertson had issues with the billable hours language in the draft of the employment agreement and language about Robertson's alcohol use. The Court finds that these issues support the finding that the Agreements were not in a final, agreed on form.

h. Robertson testified that he would not have signed the Agreement without having an Attorney go over the Agreement with his, his wife's, and the corporations' interests all taken into account. Robertson also testified that he put up his condo to guarantee obligations of the Corporations. He also testified that he was guarantor for letters of credit for the corporations. Robertson testified that he would not have signed a Stock Purchase Agreement without the guarantees of AmOrient Engineering's and AmOrient Contracting's obligations being taken on by the new owner. The August 10, 2015 draft versions of the Stock Purchase Agreements and all subsequent versions did not address Robertson's guarantees of the corporations' obligations and the use of his condo for the same.

i. Robertson also testified that he would not have agreed to Paragraph W on Page 9 of the AmOrient Engineering Stock Purchase Agreement (Pl's Exhibit 16) which stated that all key employees would remain employed with AmOrient. Robertson testified he had no such power over his employees, and thus he could not agree to that term.

CV0775-16 Wirges v. Robertson *et al.*　　　　　　　　　　　　　　　　　　　　Page **7** of **23**
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

22. Robertson and the Plaintiff executed an Amendment to the Option to Purchase Stock Agreement on November 10, 2015. The Amendment increased the option price to Eighty Five Thousand Dollars ($85,000.00). The November 10, 2015 Amendment to the Option to Purchase Stock Agreement was admitted into evidence at trial as Plaintiff's Exhibit Eighteen. The Plaintiff also tendered a cashier's check to Robertson for the additional Sixty Thousand Dollars ($60,000.00). Robertson testified that he told the Plaintiff that he would not sign any final document until they were reviewed by a lawyer.

23. The Plaintiff testified that at the time of the execution of the Amendment to the Option to Purchase Stock Agreement, the Plaintiff informed Robertson that he would personally be responsible for buying out Coffman's shares if they did not agree to let the sale go forward. The Defendants also testified the Plaintiff offered to be personally responsible for the buyout of Coffman's ownership in AmOrient Engineering and AmOrient Contracting.

24. In January 2016, representatives from Coffman came to Guam and met with the Plaintiff and Robertson. Robertson, Bonsembiante, Schmidt, and the Plaintiff all testified that subsequent to

---

j. Further, the Defendants also provided evidence that Robertson retained and paid the law firm of Carlsmith Ball approximately Eight Thousand Dollars ($8,000.00) to review the relatively smaller transfer of forty percent (40%) of Robertson's ownership to Coffman in 2012. Therefore, the Court finds there is evidence that supports Robertson's testimony that he had intended that a lawyer review the Stock Purchase Agreements before the Agreements were finalized.

k. Both of the Stock Purchase Agreements similarly had signature lines for Robertson's wife, Vannapha Khaika Robertson ("Mrs. Robertson"). Robertson testified that his wife and independent counsel needed to review the Stock Purchase Agreements before they were finalized. Robertson further testified that his wife would likely need the Agreements explained to her since Mrs. Robertson's first language is not English. These facts support a finding that the Stock Purchase Agreements were not finalized as of August 19, 2015.

l. The Defendants also introduced evidence that Schmidt continued to work on documents related to the sale of the shares in the companies after August 19, 2015. See supra Note 5. While Schmidt and the Plaintiff did try to rebut this evidence, the Court would again note that Schmidt is not a credible witness. Schmidt's lack of credibility and the weight of the evidence discussed above cut against the Court accepting the Plaintiff's version of events.

m. Finally, in Schmidt's August 10, 2015 email to Gardner, Schmidt uses the word 'drafts' to describe the attached versions of the Stock Purchase Agreements. Further, Schmidt testified that when the Outline of the Terms of the Sale were drafted, "it had been assumed all along based on comments by Coffman by Dave Gardner that they wouldn't stand in the way, that they would own 40% of the stock." Bench Trial Proceedings, Testimony of Fred Schmidt 2:36:45 p.m.-2:37:02 p.m. (Nov. 21, 2017). These facts again cut against finding that the same documents emailed to Coffman on August 10, 2015, were the final versions of the Stock Purchase Agreements agreed to by the Parties. Especially, in light of Coffman's notice of exercise of the Put Option by the email from Gardner that Schmidt forwarded to Robertson on August 12, 2015, and Coffman and Robertson's further negotiation of the terms of the redemption of Coffman's shares under the Put Option after August 19, 2015.

CV0775-16 Wirges v. Robertson et al.            Page 8 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

that meeting, it was clear that Coffman would not accept the Plaintiff as the new owner of the AmOrient Engineering and AmOrient Contracting.

25. A January 20, 2016 email from Robertson to Gardner was admitted at trial as Plaintiff's Exhibit Twenty. The email was responding to an offer[7] from Coffman for AmOrient Engineering and AmOrient Contracting to buy out all of Coffman's shares. In the email, Robertson stated he was disappointed that Coffman intended to redeem all of Coffman's Forty Percent (40%) of the outstanding shares in AmOrient Engineering and AmOrient Contracting. Robertson made clear Coffman's terms were not viable from AmOrient's standpoint.

26. On April 18, 2016, the Plaintiff and Robertson executed a Notice of Exercise of Option. The Notice was admitted into evidence at trial as Plaintiff's Exhibit Twenty-Four. The Plaintiff and Robertson testified that they had lunch the day the notice was signed. To prepare for closing, Robertson wrote in a target closing date of July 15, 2016.

27. Anticipating the closing, the Parties also moved forward on a plan to share offices. Sometime after the notice of option was executed, the Plaintiff's company Sterling began renovating space at the KG Plaza in Tamuning in anticipation of sharing space with AmOrient Engineering and a GoPro Distributing Business owned by the Plaintiff and Schmidt. The Defendants offered testimony of Bonsembiante, Gregory Cantello ("Cantello") the Managing Engineer of AmOrient and Uli Lenckowski ("Lenckowski") an AmOrient Construction Manager, all of whom stated that the renovation work performed by Sterling was defective.[8]

---

[7] Coffman offered to sell the forty percent (40%) shares in AmOrient Engineering and Am Orient Contracting for Two Hundred Sixty Thousand Dollars ($260,000.00) payable over 18-24 months, and with immediate repayment of Coffman's loan to AmOrient Engineering.

[8] Bonsembiante's, Cantello's and Lenckowski's testimony is summarized below.
   a. Bonsembiante testified that he was not pleased with way renovation was handled and had several concerns. In his opinion, the renovation work was not run in an efficient way, with too many stops and goes, and some quality issues. Bonsembiante also testified that certain things had to be redone or reworked. Specifically, Bonsembiante mentioned the drywall finish was not up to what he expected, and the partition walls were out of line. Bonsembiante also testified that the walls were painted without removing the staples. Finally, Bonsembiante testified that some electrical work had to be reworked.
   b. Cantello testified that the quality of work performed, overall fit and finish, and attention to detail for the renovation was not up to what Cantello was normally used to seeing. Cantello specifically testified that the way the partition walls were constructed resulted in the walls not being level. He further testified the dry wall finishing was not done properly, and that you could see staples and mesh tape in the dry wall after the walls were painted. Cantello testified that the mesh tape and staples should have been removed prior to the walls being painted. Cantello further testified

CV0775-16 Wirges v. Robertson *et al.*                                                                                     Page 9 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

28. In June of 2016, while Robertson was vacationing in Houston, Texas, Bonsembiante was returning from a trip to South America. On June 14, 2016, Bonsembiante visited Robertson in Texas to update Robertson on the trip to South America and to discuss the sale of AmOrient. Robertson and Bonsembiante had what Robertson later called a 'Special Meeting.' Robertson prepared a Report of Special Meeting which summarized what Bonsembiante and Robertson discussed. The Report of Special Meeting was admitted into evidence at trial as Plaintiff's Exhibit Twenty-Five. Robertson and Bonsembiante testified that the document was prepared by Robertson, in his own words, and did not contain the exact words Bonsembiante used.

29. Bonsembiante testified that he and Robertson had a conversation. He further testified that he was beginning to have doubts about the sale prior to the Special Meeting. Bonsembiante further testified that he knew Robertson was selling so he could retire, and thus Bonsembiante did not express his doubts to Robertson prior to the Special Meeting. At the meeting, Bonsembiante informed Robertson that if the sale went through, he would resign. Bonsembiante testified that Robertson then asked him why he would resign and their conversation, as summarized by Robertson, is what appears in the Report of Special Meeting.[9] During his testimony, Bonsembiante addressed each of the paragraphs of Robertson's Report of Special Meeting. Bonsembiante's testimony is summarized below.

---

about defects in the type of wood used for certain parts of Sterling's work. Because of the poor quality of the wood, sap ran and was visible where there were defects. Further, Cantello testified that there are knots on several of the partition walls and workspaces. These knots make the surfaces unlevel. Cantello also stated he instructed Sterling employees about painting and priming, and even with such instruction, the resulting work shows that Sterling did not follow his instructions. Cantello also testified that certain drawing tabletops and work surfaces are currently becoming detached from the walls because they were not secured well during the initial construction. Finally, Cantello testified that while he did not personally redo any work performed by Sterling, he did indicate that work needed to be redone. After being informed, Sterling did redo some of the work. Cantello specifically remembered having electrical circuitry-related work redone.

c. Lenckowski testified that he compiled a list of things in the office that one could observe as having poor workmanship in their construction. Specifically, Lenckowski testified that wood used to build several desks are loose. He testified that if one presses on one side of the desk, the entire table comes up. Lenckowski further testified that wood boards used for the top of workspaces were not prepared correctly. He testified that Sterling did not remove a portion of wood which was improper and now those portions of wood are coming out. He also testified that several tiles are out of line and as a result they are not flat.

[9] The Plaintiff did not refute Bonsembiante's testimony that Robertson asked Bonsembiante why he would resign.

CV0775-16 Wirges v. Robertson *et al.*                                                                              Page **10** of **23**
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

a. Bonsembiante said that if Robertson sold to the Plaintiff, Bonsembiante did not think he would be given latitude to control the company. Bonsembiante also testified that his and the Plaintiff's management styles were different and he was not prepared to work with someone whom he did not see eye to eye with.

b. Bonsembiante further testified that his impression was that the Plaintiff intended to use AmOrient to provide engineering for Sterling at low, or no cost whatsoever. Bonsembiante thought that would hurt AmOrient. He further testified that he thought the business would falter and fall under the Plaintiff, which is why he would seek work elsewhere. Bonsembiante testified that that was his opinion of what would occur.

c. Bonsembiante also testified that he expressed his concerns to Robertson about the renovation work by Sterling on the shared office space. See supra Note 8.

d. Bonsembiante also testified that he was promoting AmOrient Business and was attempting to sign Hansell Phelps as a client for engineering services. Bonsembiante thought the Plaintiff as the potential owner should be aware and thus told the Plaintiff about his efforts. The Plaintiff told Bonsembiante not to use his name with Hansell Phelps. Bonsembiante informed Robertson of this sequence of events at the Special Meeting. While Robertson wrote in the Report that there seemed to be "more than a mere misunderstanding" related to the Hansell Phelps issue, Bonsembiante made clear that those were Robertson's words, not his.

e. Bonsembiante stated that the discussion about businessmen and the Plaintiff's comments in South America about a private jet did occur; though again Bonsembiante clarified Robertson summarized the conversation in his own words. Bonsembiante testified that he remembered the businessmen in South America stated in Spanish that they did not believe the Plaintiff's statement about flying from Guam with such a small company for a retreat. Bonsembiante testified that the businessmen were joking in Spanish, which he speaks and understands. He also offered testimony that the Plaintiff did not speak Spanish, which the Plaintiff did not dispute.

CV0775-16 Wirges v. Robertson et al.                                                Page **11** of **23**
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

f. Bonsembiante also testified that with regard to the Plaintiff's purchase of property in Manila, Robertson summarized the discussion in his own words. Bonsembiante testified that he told Robertson that in his opinion, from the time the property became available to the time the Plaintiff purchased the property in a foreign country was too fast. Bonsembiante stated that he made this comment in the context of telling Robertson that in the way he thinks and operates, he could not work with someone who makes decisions that quickly because it would be very stressful for him.

g. With regard to the lavish-lifestyle related comment, Bonsembiante testified that the Plaintiff accompanied him on trips to South America, including Uruguay, Paraguay and Argentina. Bonsembiante stated that the Plaintiff was interested in development projects in South America. Bonsembiante testified that Robertson's summary of the lavish lifestyle comment was not precisely what he said. He stated that what he told Robertson was that AmOrient is a small company and always tried to reduce expenses, including as an example, travelling coach. He stated that in his opinion he would not spend that amount of money the Plaintiff spent for business class travel on their trips, and he worried the impact such travel habits would have on AmOrient's finances. Bonsembiante testified he told Robertson this in the context of discussing how AmOrient's size as a small business and his management style of keeping expenses low would not work well together with the Plaintiff's spending as demonstrated during their time travelling together.

h. Bonsembiante stated that Robertson and he had a misunderstanding because Robertson's special report states the Plaintiff told Bonsembiante that all future payments for the sale of AmOrient would come from AmOrient profits. Bonsembiante stated that Schmidt told him that, not the Plaintiff. Bonsembiante further testified that this statement was made in the context of informing Robertson that he and Cantello could not continue to work with AmOrient if this were true because they would be working for a company with a bad financial position which would not have funds for bonuses and pay raises for example.

CV0775-16 Wirges v. Robertson *et al.*                                                        Page **12** of **23**
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

i. Finally, Bonsembiante stated that he told Robertson in different words than were used in the Report of Special Meeting that if the Plaintiff exerted influence and Bonsembiante did not have full control of the Company, he did not see that it would work and would quit. Bonsembiante testified that Cantello expressed the same thing to him. Cantello and Lenckowski also both testified that they told Bonsembiante they would quit if the Plaintiff became the owner of AmOrient Engineering.

30. The Report of Special meeting also stated,

> "Robertson observed that the Option for Wirges to buy shares in the two AmOrient companies was the only document executed between the parties. The other supporting documents had never been agreed to and Wirges had been informed that the drafts prepared by Fred Schmidt had to be amended following further review by himself and then required scrutiny by an attorney of Robertson's choosing since Schmidt is not an attorney. The Option is thus not enforceable because the various terms and conditions were never agreed to."

Pl's Trial Ex. 25.

31. On July 5, 2016, Robertson informed the Plaintiff by letter that he would not consider the sale of his stock in AmOrient Engineering and AmOrient Contracting any further. The Letter from Robertson to the Plaintiff was admitted into evidence as Plaintiff's Exhibit Twenty-Seven. The letter states that the Option Purchase Agreement dated August 19, 2015 makes reference to Exhibits 'A' and 'B' which were *anticipated* to contain material terms of the Stock Purchase but that they did not exist in any agreed upon form and therefore the agreement was unenforceable. Robertson also offered that Coffman's Put Option has severe consequences should he sell any of his shares without Coffman's concurrence. Coffman's failure to concur, according to the Letter was a principal reason for the delay in closing the sale. Finally, Robertson offered to return the amounts advanced to him as consideration for the Option Agreement.

32. The Plaintiff responded to Robertson's Letter, by Letter dated July 8, 2016. The Plaintiff's Letter was admitted into evidence at trial as Plaintiff's Exhibit Twenty-Nine.

/ / /

/ / /

CV0775-16 Wirges v. Robertson *et al.*                                                                            Page 13 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

## CONCLUSIONS OF LAW

The First Amended Complaint in this matter pleads the following claims for relief: (1) Specific Performance [Breach of Contract]; (2) Damages [Breach of Contract]; (3) Refund; (4) Inducing Breach of Contract against Bonsembiante; and (5) Interference with Prospective Economic Advantage against Bonsembiante. First Am. Compl. ¶¶ 1-47 (June 16, 2017). Prior to trial, the Plaintiff withdrew the claim for Specific Performance. See Pl's Notice of Election of Remedies (Aug. 31, 2017). Thus the Court will address claims two through five separately below.

**i. Damages for Breach of Contract**

The Plaintiff posits that the Option Agreement was a fully enforceable and binding agreement on the Parties. The Plaintiff further posits that because Robertson did not convey his shares in AmOrient Engineering and AmOrient Contracting after Plaintiff gave notice of his exercise of the Option, Robertson is liable to the Plaintiff for breach of contract. The Defendant argues there is no enforceable agreement because the Parties did not agree on the terms of the Stock Purchase Agreements for AmOrient Engineering and AmOrient Contracting.

To prevail on a breach of contract claim, the "plaintiff must prove (1) the existence of the contract, (2) the plaintiff's performance or excuse of nonperformance, (3) the defendant's breach, and (5) resulting damages to the plaintiff." Hemlani v. Hemlani, 2015 Guam 16 ¶ 19. Here the Court need look no further than the first element, the existence of a contract.

Under Guam law, a contract is "an agreement to do or not do a certain thing." 18 GCA § 85101 (2017). For a contract to exist, Guam law requires there be (1) parties capable of contracting, (2) consent, (3) a lawful object, and (4) a sufficient cause or consideration. See 18 GCA § 85102. Section 85102 mirrors the language in the California Civil Code for the requirements of a contract. See Cal. Civ. Code § 1550 (West 2018). Thus, California case law is highly persuasive to the Court's analysis herein. See Sumitomo Constr. Co. v. Zhang Ye, Inc., 1997 Guam 8 ¶ 17 (reasoning "[g]enerally when a legislature adopts a statute which is identical or similar to one in effect in another jurisdiction, it is presumed that the adopting jurisdiction applies the construction placed on the statute by the originating jurisdiction").

CV0775-16 Wirges v. Robertson *et al.*
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page **14** of **23**

The requirement of consent in contract formation is also referred to as 'mutual consent' or 'mutual assent.' Mutual consent is usually accomplished through the process of offer and acceptance. See DeLeon v. Verizon Wireless, LLC, 143 Cal.Rptr.3d 810, 820 (Cal. Ct. App. 2012). Mutual assent is required for the formation of a contract. See e.g., Blas v. Cruz, 2009 Guam 12 ¶¶ 16-19. Generally the requirement of mutual consent requires that the parties "agree on the same thing in the same sense." HM DG, Inc., v. Amini, 162 Cal.Rptr.3d 412, 419 (Cal. Ct. App. 2013); see also, Banner Entertainment, Inc., v. Superior Court (Alchemy Filmworks, Inc.), 72 Cal.Rptr.2d 598, 604 (Cal. Ct. App. 1998) (holding "the failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*" (italics in original)). When a Court is determining whether a valid contract is formed, the Court looks to objective manifestations of mutual assent. See Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc., 107 Cal.Rptr.2d 645, 651 (Cal. Ct. App. 2001). If there is no evidence presented "establishing a manifestation of assent to the same thing by both parties, then there is no mutual consent to contract and no contract formation." Bustamante v. Inuit, Inc., 45 Cal.Rptr.3d 692, 698-99 (Cal. Ct. App. 2006). Where the existence of a contract is at issue and where there is conflicting evidence, "it is for the trier of fact to determine whether the contract actually existed." Id. at 699.

Here, the Plaintiff brings the breach of contract related action for damages for an alleged breach of an Option Agreement between the Plaintiff and Robertson. An option contract is comprised of "two contracts, the option contract and the contract to which it relates." City of Orange v. San Diego County Employees Retirement Assn., 126 Cal. Rptr. 2d. 405, 410 (Cal. Ct. App. 2002). An option is a specific type of agreement "which is a continuing offer to sell, [and] may be revoked prior to being accepted *unless* the option is supported by consideration." Mobil Oil Guam, Inc. v. Tendido, 2004 Guam at ¶ 24 (citing Riley v. Campeau Homes (Texas) Inc., S.W.2d 184, 187 (Tex. App. 1991)). The Supreme Court of Guam has discussed the two separate agreements as "(1) the underlying contract that is not binding until accepted; and (2) a covenant to hold open to the optionee the opportunity to accept." Mobil Oil Guam, Inc., 2004 Guam at ¶ 23. The substance of the

CV0775-16 Wirges v. Robertson *et al.*                                          Page 15 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

option empowers the holder of the option "to compel a sale of the property on the stated terms before the expiration of the option." Id. at ¶ 25. The Court finds that it follows that if there are no stated terms underlying the option agreed on by the parties, then the option is unenforceable.

Therefore, the Court concludes to succeed on the alleged breach of an Option Agreement claim advanced by the Plaintiff, the Plaintiff must demonstrate both a valid option agreement, and a valid underlying agreement. Here neither exists. The Court concludes the Option Agreement, by its own terms is too indefinite to render the agreement a legally enforceable contract. The Supreme Court of Guam has made clear that for an agreement to be enforceable; the Parties must mutually assent to the same terms.

The Plaintiff has the burden to prove each element of breach of contract. A required element is the existence of an enforceable agreement. Here the Plaintiff has not demonstrated the existence of an enforceable agreement. The Plaintiff has not shown that Robertson and the Plaintiff mutually assented to the terms of the Stock Purchase Agreements underlying the Option Agreement. The only evidence of Robertson and the Plaintiff agreeing to terms related to the sale is that they both executed the Outline for Terms of Sale of AmOrient Engineering and AmOrient Contracting. However, the Outline itself expressly provided that "the execution of this document is expressly contingent upon the *mutual agreement* to and *execution* of formal Stock Purchase Agreements by both parties for the sale and purchase of the shares of each corporation." Pl's Trial Ex. 4 cited supra ¶ 12. (*emphasis added*).

Here, there were no Stock Purchase Agreements attached to the Option Agreement when the Agreement was executed on August 19, 2015. Further, the Court has already found that no meeting took place on August 19, 2015 to review the Stock Purchase Agreements. The Option Agreement provided that the Parties agreed that Robertson would sell and the Plaintiff would buy, Robertson's shares of AmOrient Engineering and AmOrient Contracting "in accordance with the terms and conditions of the Stock Purchase Agreements attached hereto as Exhibits 'A' and 'B.'" Pl's Trial Ex. 8.

CV0775-16 Wirges v. Robertson *et al.*
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page **16** of 23

Importantly, the outline for the terms of sale included, among other items, that the sale was conditioned on approval from Coffman. There is no evidence that Coffman approved the terms of the Stock Purchase Agreements prior to August 19, 2015. Further, the approval of Coffman was not provided for in the Stock Purchase Agreements, which supports the Defendant's position that as of August 19, 2015, the Stock Purchase Agreements were still in draft form and had not been finalized. Additionally, after August 19, 2015, Robertson continued to negotiate with Coffman about the redemption of their shares. In January 2016, Coffman gave notice of the intent to redeem all of its shares in AmOrient Engineering and AmOrient Contracting. While the Plaintiff testified that he was willing to be personally liable for the shares, the Court notes that AmOrient was obligated pursuant to the 2012 shareholder's agreement to redeem shares at the enterprise price. Therefore the Plaintiff may have intended to purchase the shares, but if Coffman rejected his offers and the sale of the Robertson's stock went through, then the Corporations were obligated to redeem, not the Plaintiff. Thus, the lack of approval of Coffman, and the failure to provide for such contingency in the Stock Purchase Agreements similarly demonstrates Robertson and the Plaintiff had not reached a final agreement as of August 19, 2015.

The Court finds the evidence introduced by the Defendants to be convincing. Robertson had not reached the point where he was ready to accept the offer of the Plaintiff to buy his shares. The Court finds the argument that Robertson would want an attorney to review the Stock Purchase Agreement prior to agreeing to convey his majority interest is reasonable because that is precisely what he did when he conveyed a minority interest in AmOrient Engineering and AmOrient Contracting to Coffman.

Further, internal inconsistencies in the Stock Purchase Agreements also demonstrate to the Court that the documents had not been agreed upon in any final form. Schmidt himself described the documents as drafts when he sent the documents to Coffman. Further, Schmidt continued to work on the Stock Purchase Agreements for both companies, and other documents related to the sale after August 19, 2015.

CV0775-16 Wirges v. Robertson *et al.*                                                    Page 17 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

The Plaintiff argued during closing that Robertson's terms of employment were sufficiently laid out in the Outline for the Sale of Terms. The draft stock purchase agreements introduced as Plaintiff's Exhibits Sixteen and Seventeen provided for an attached employment agreement for Robertson. Robertson disputes that he ever agreed to the terms of the employment agreement. The Court notes that even after August 19, 2015, Robertson raised issues about the language tying his compensation to billable hours. There was also testimony that Robertson took issue with language related to his alcohol use. Thus the Court finds that the terms of Robertson's employment had not been fully agreed on in any final form.

Finally, during closing arguments the Plaintiff argued that whether the documents were attached to the Option Agreement when it was signed or not is not critical to this matter. The Court disagrees. An Option Agreement, as discussed above is comprised of two agreements, an agreement to keep an offer open, and the underlying agreement created by the offer kept open by the option. If the Parties did not have a clear understanding of the terms of the underlying agreement, then the Option Agreement itself is unenforceable because the Option Agreement lacks mutual assent. The Court finds that is what occurred here. The Option Agreement was entered into and the Parties had not finalized the terms of the underlying agreements for the sale of AmOrient Engineering and AmOrient Contracting.

Were this Court to attempt to enforce, or award damages based on the, Option to Purchase based on the draft Stock Purchase Agreements, the Court would have to determine which version of terms to enforce because there is insufficient evidence of the terms Robertson agreed to. The Parties chose the language that the Option was an Option to purchase based on the Stock Purchase Agreements attached as Exhibits A and B. Because there were no Exhibits A and B attached to the Option Agreement, and because the court finds the Stock Purchase Agreements were not agreed to in any final form, the Court is unclear of what terms would constitute an agreement. Thus, the Court cannot find that a valid contract was formed by Robertson and the Plaintiff because the Plaintiff has failed to show the requisite mutual assent to the terms of an agreement. Therefore, without a valid,

CV0775-16 Wirges v. Robertson *et al.*                                                    Page **18** of **23**
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

enforceable agreement, the Court cannot find that the Robertson is liable to the Plaintiff for damages arising from breach of contract.

**ii. Refund**

In the First Amended Complaint the Plaintiff pleads that if he is denied damages for breach of contract, "he is nevertheless entitled to a refund from Robertson of his $85,000.00 in payments made to Robertson pursuant to the Option Agreement." First Am. Compl. ¶ 35. During closing arguments, the Plaintiff did not address his claims for a 'refund.' However the Court finds the legal conclusion that the Option Agreement is unenforceable above requires this Court to invoke its powers of equity.

Recovery in *quantum meruit* as discussed by the Supreme Court of Guam in Tanaguchi-Ruth & Associates v. MDI Guam Corp., 2005 Guam 7 ¶ 27, is appropriate here. In Tanaguchi-Ruth, the Supreme Court reasoned "the essence of *quantum meruit* liability is the receipt of a benefit by one party which would be inequitable for that party to retain." Tanaguchi-Ruth, 2005 Guam 7 at ¶ 27. The Supreme Court held the "elements of *quantum meruit* liability distilled from this essence are the (1) performance of services by the plaintiff, (2) the receipt of the benefit of those services by the defendant and (3) the unjustness of the defendant's retention of that benefit without compensating the plaintiff." Tanaguchi-Ruth & Associates v. MDI Guam Corp., 2005 Guam 7 ¶ 27 (citing Midcoast Aviation, Inc., v. Gen. Elec. Credit Corp., 907 F.2d 732, 737 (7th Cir. 1990)). The Guam Supreme Court also made clear that "[r]ecovery should be allowed even where the parties have attempted to make a contract which is void because its terms are too indefinite, but where one party has, in good faith, and believing that a valid contract existed, performed part of the services which he had promised in reliance upon it." Tanaguchi-Ruth, 2005 Guam 7 at ¶ 40 (citing Coleman Eng'g Co. v. North American Aviation, Inc., 65 Cal.2d 396, 419-20 (Cal. 1966)).

Here, the Plaintiff performed under the Option Agreement by tendering the initial Twenty-Five Thousand Dollars ($25,000.00) and the additional Sixty Thousand Dollars ($60,000.00) to Robertson in consideration for what the Plaintiff thought was a valid Option to purchase Robertson's stock in AmOrient Engineering and AmOrient Contracting. Because this Court found the Option

CV0775-16 Wirges v. Robertson *et al.*                                    Page **19** of **23**
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Agreement unenforceable, Robertson's retention of the Eighty Five Thousand Dollars ($85,000.00) would amount to an unjust retention of his benefit of the bargain under the invalid Option Agreement. Thus, the Court concludes that the Eighty Five Thousand Dollars ($85,000.00) should be returned to the Plaintiff.

### iii. Inducing Breach of Contract Against Bonsembiante

The Supreme Court of Guam recognized a cause of action for interference with contractual relations in, Lujan v. J.L.H. Trust, 2016 Guam 24. The elements of this cause of action are, "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Lujan v. J.L.H. Trust, 2016 Guam 24 ¶ 30 (citing CRST Van Expedited, Inc. v. Werner Enters., Inc., 479 F.3d 1099, 1105 (9th Cir. 2007) (internal quotations and citations omitted)).

The Plaintiff points to the Restatement (Second) of Torts § 766, and argues that the restatement does not require a valid contract to succeed on an inducement to breach a contract claim. The Court notes that the Supreme Court cited positively to, CRST Van Expedited, Inc., 479 F.3d 1099 (9th Cir. 2007), which was a Federal Ninth Circuit Court of Appeals applying California law in a diversity action. Having found that Guam looks to California case law as highly persuasive in the area of contract law, the Court concludes that California law and the elements in J.L.H. Trust, govern this Court's inquiry. Thus, having found that the Option Agreement was not a valid and enforceable contract, the Plaintiff's claim against Bonsembiante for interference with contractual relations is barred as a matter of law because there is no valid enforceable contract here.

### iv. Intentional Interference with Prospective Economic Advantage Against Bonsembiante.

Finally, in the First Amended Complaint, the Plaintiff pleads a claim for Intentional Interference with Prospective Economic Advantage against Defendant Bonsembiante. The Plaintiff posits that "on or about June 14, 2016, the Defendant intentionally interfered with Wirges' prospective economic advantage by communicating false and malicious statements regarding Wirges to the Defendant Robertson." First Am. Compl. ¶ 45. The Plaintiff further posits that "as a result of

CV0775-16 Wirges v. Robertson et al.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page 20 of 23

said false and malicious statements by Bonsembiante to Robertson, Robertson breached said Option Agreement by letter dated July 5, 2016." Id.

The Supreme Court of Guam has cited positively to, Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 950 (Cal. 2003), in a discussion surrounding the tort of Intentional Interference with Prospective Economic Advantage. See JWS Refrigeration & Air Conditioning, Ltd. v. Cain, 2013 Guam 9 ¶ 31. In Korea Supply Co., the Supreme Court of California recognized the following elements of Interference with Prospective Economic Advantage, "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." Korea Supply Co., 63 P.3d at 950. However, the Supreme Court of California has also made clear that "a plaintiff seeking to recover damages for interference with prospective economic advantage must plead and prove as part of its case-in-chief that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." Della Penna v. Toyota Motor Sales, U.S.A., Inc. 902 P.2d 740, 751 (Cal. 1995). This requirement has been interpreted to mean that the conduct must be independently actionable conduct. See Korea Supply Co., 63 P.3d at 953-54. An act is independently wrongful, and therefore actionable, if "it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." Id. The Plaintiff has the burden of proving the elements of Intentional Interference with Prospective Business Advantage. Della Penna, 902 P.2d at 751.

The Restatement (Second) of Torts § 772 provides for defenses to the tort of intentional interference with prospective economic advantage. Section 772 provides that a defendant who causes a third person not to perform a contract does not interfere improperly with the plaintiff's contractual relation by giving the third person either truthful information or honest advice within the scope of request for advice. At least two California cases have cited positively to Restatement (Second) of Torts § 772. See Savage v. Pacific Gas & Electric Co., 26 Cal.Rptr.2d 305, 315 (Cal. Ct.

CV0775-16 Wirges v. Robertson et al.                                         Page 21 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

App. 1993); see also, Francis v. Dun & Bradstreet, Inc., 4 Cal.Rptr.2d 361, 346 n. 4 (Cal. Ct. App. 1992). Thus this Court can look to the defenses in Restatement § 772 to dispose of the instant case.

The Plaintiff argues "Robertson would probably have completed the sale of his stock to Wirges as planned but for Bonsembiante's false and misleading statements regarding Wirges." Pl's Trial Brief 16 (Nov. 1, 2017). However the Court again disagrees. As the Plaintiff bears the burden of establishing the elements of Intentional Interference with Prospective Economic Advantage, the Court finds the Plaintiff has not met his burden here. The Plaintiff has failed to put on sufficient evidence that the Report of the June 14, 2016 Special Meeting was exactly what Bonsembiante said to Robertson. Instead, Robertson and Bonsembiante testified that Bonsembiante told Robertson he would quit if the sale of stock to the Plaintiff went through. First, the Court would note that Bonsembiante was free to end his employment for any reason, as there was no evidence of a binding agreement for him to remain employed with AmOrient or otherwise. Second, the statement about resigning was not independently wrongful because there is no cause of action that the Plaintiff asserts against Bonsembiante based on his intent to resign from AmOrient.

After Robertson asked why Bonsembiante intended to quit if the sale went through, then Bonsembiante made several comments about his reasons for quitting. See supra Findings of Fact ¶¶ 29 a. – i. The Plaintiff did not present any evidence which demonstrated that Robertson had recorded Bonsembiante's comments verbatim. Instead, the only testimony before the Court is Bonsembiante's testimony that Robertson used different phrasing than what Bonsembiante told him at the Special Meeting. Further, the evidence shows that in the context of Robertson asking Bonsembiante why he would resign, Bonsembiante shared several opinions about why he could not work for a company owned by the Plaintiff. Thus, under § 772, Bonsembiante has demonstrated that his comments were his opinion, in response to Robertson's inquiry as to why Bonsembiante would quit if the sale went through. The Court finds that the Plaintiff has failed to show that any of the statement made by Bonsembiante, when viewed in the context of the conversation Robertson and Bonsembiante were having, is independently actionable apart from the alleged interference with prospective economic

CV0775-16 Wirges v. Robertson et al.                                                                Page 22 of 23
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

advantage. Thus the Plaintiff has not met his burden on the Intentional Interference with Prospective Economic Advantage Claim.

## CONCLUSION & ORDER

Based on the Findings of Fact and Conclusions of Law laid out above, the Court **ORDERS**:

1. John M. Robertson shall return the sum of Eighty Five Thousand Dollars ($85,000.00) to Michael J. Wirges.

A status hearing is set for May 17, 2018 at 9:00 a.m.

**SO ORDERED** MAY 0 1 2018 _____.

_____
The Honorable Anita A. Sukola
Judge, Superior Court of Guam

**SERVICE VIA COURT BOX**
I acknowledge that a copy of the original hereto was placed in the court box of:
Berman O'Connor & Mann
T. Tarpley Jr.
Date: 5·1·18   Time: 3:15pm
_____
Deputy Clerk, Superior Court of Guam

CV0775-16 Wirges v. Robertson *et al.*
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(re Compl. for Breach of Contract and Related Tort Claims)

Page **23** of **23**